FILED
2008 Feb-08  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KERRY WILLIAMS,          )
                          )
        Plaintiff      )
                          )
vs.               )     Case No.  2:05-cv-02294-HGD
                          )
HOOVER CITY BOARD    )
OF EDUCATION, et al.,    )
                          )
     Defendants   )

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendants.  (Doc. #24).  Plaintiff, Kerry Williams, filed a complaint against the City of Hoover Board of Education, and Gena Morris and Vince DiLorenzo, in their individual capacities, alleging that he was subjected to a discriminatory demotion on the basis of his race, in violation of 42 U.S.C. § 1983 and Title VII.  Following a review of the summary judgment submissions of the parties and their briefs, the Court rules as follows.

### SUMMARY JUDGMENT STANDARD

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P.  Summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

    This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of

material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## DISCRIMINATION LAW GENERALLY

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In evaluating Title VII

claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff.  *Id.* at 253, 101 S.Ct at 1093.

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, at 253, 101 S.Ct., at 1093.  In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977).  The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra*, 438 U.S., at 577, 98 S.Ct., at 2949.  Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.  The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine*, *supra*, 450 U.S., at 253, 101 S.Ct., at 1093.

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the *prima facie* case has been

eliminated, the plaintiff has the opportunity to discredit the defendant's proffered

explanations for its decision.  According to the Supreme Court:

> [The plaintiff] now must have the opportunity to
> demonstrate that the proffered reason was not the true
> reason for the employment decision. . . .  [The plaintiff]
> may succeed in this either directly by persuading the court
> that a discriminatory reason more likely motivated the
> employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence.

*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (citation omitted).  In other words, the

plaintiff has the opportunity to come forward with evidence, including the previously

produced evidence establishing the *prima facie* case, sufficient to permit a reasonable

fact-finder to conclude that the reasons given by the employer were not the real

reasons for the adverse employment decision.  *Id.*; *McDonnell Douglas*, 411 U.S. at

804, 93 S.Ct. at 1825.

To show that the employer's reasons were pretextual, the plaintiff must

demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact-finder could find them unworthy of credence." *Combs v. Plantation

Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  "If the plaintiff does not proffer

sufficient evidence to create a genuine issue of material fact regarding whether each

of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*); *see also Cooper v. Southern Co.*, 390 F.3d 695, 725 -726 (11th Cir. 2004); *Combs*, 106 F.3d at 1529 (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").

## PROCEDURAL BACKGROUND

Williams filed his complaint on November 4, 2005.  In Count One, he alleges that he was discriminated against in violation of 42 U.S.C. § 1983.  In Count Two, he alleges that he was denied promotions based on his race in violation of § 1983 and Title VII of the Civil Rights Act of 1964, as amended.  (Doc. #1, Complaint).

On February 19, 2007, defendants filed a joint motion for summary judgment. (Doc. #24).  The motion was supported by evidentiary submissions and a brief. (Doc. #25, Evidentiary Materials; Doc. #26, Brief in Support of Summary Judgment). Plaintiff filed a response to this motion on March 12, 2007 (Doc. #28, Response of Plaintiff), and defendants filed a reply on March 23, 2007.  (Doc. #30, Reply of Defendants).

## FACTUAL BACKGROUND

Plaintiff is an African-American school teacher and former coach at Spain Park High School (Spain Park) in Hoover, Alabama.  Defendants, Gena Morris and Vince DiLorenzo, are employees of the City of Hoover Board of Education who, among other things, worked as coaches for basketball and football teams, respectively, at Spain Park during the time the violations by defendants were alleged to have occurred.  Williams also worked as a basketball and a football coach at Spain Park until he resigned these positions.

According to his complaint, Williams claims that, during his employment with the Hoover Board of Education, he was demoted while less qualified white individuals were hired to coaching positions instead of him.  He asserts that the acts constituting discrimination against him were committed by defendants Hoover Board of Education, Morris, and DiLorenzo.

At the time of his hiring in 2001, Kerry Williams was the only African-American coach at Spain Park.  (DiLorenzo Depo. at 59).  During the 2002-2003 school year, he was a varsity assistant football coach at Spain Park.  (Williams Depo. at 12).

Williams attended Midfield (Alabama) High School where he played football as quarterback and free safety.  He also played basketball.  He attended the University of Southern Mississippi on a football scholarship and was in the starting line-up for three years.  (*Id*. at 49-50).

Williams returned to Midfield High School and was an assistant football coach from 1995 to 1999, coaching defensive backs and wide receivers.  (*Id*. at 60).  In 1999, Williams moved to Walker County (Alabama) High School, where he worked as an assistant football coach, again coaching defensive backs and wide receivers. He also coached the ninth grade basketball team.  (*Id.* at 63).  This is his only experience as a basketball coach.  (*Id*. at 63-64).

After he became head coach at Spain Park, DiLorenzo recommended that Williams be hired as an assistant coach. (DiLorenzo Aff. at 2-3).  From 2001 to 2003, Williams coached ninth and tenth grade boys in football.  However, for the first two years of its existence (2001-2003), Spain Park did not have upperclassmen. (Williams Depo. at 83-84).  In 2001, Williams coached running backs.  (*Id*. at 84).

Subsequently, another African-American, Lionel James, was hired as a coach at Spain Park and assigned to coach the running backs.  Williams was then assigned

to coach the varsity wide receivers.  Williams coached the wide receivers for the spring and fall of 2003.  (*Id*. at 88-91).

Williams was required to coach two sports (*Id*. at 65, 116-17) and also worked as an assistant coach for the girls varsity basketball team.  He received salary supplements for each of these positions.  In 2001, he received a supplement of $5,615 for working as an varsity assistant football coach and $2,330 for working as a varsity assistant girls basketball coach.  (Pla. Ex. p. 064).  In 2002, he received supplements of $5,783 and $2,400 for these positions, respectively.  (Pla. Ex. p. 063).

In addition, during the 2003 basketball season, head coach Gena Morris arranged for Williams to coach at a team camp where he was paid $1,200.  Morris arranged for Williams to coach at this clinic as a way to make up for a reduction in his supplemental pay.

The supplement for the junior varsity head coach for football in 2004 was $3,800.  For a varsity assistant coach for football, it was $6,000.  Also for 2004, the supplement for a junior varsity assistant basketball coach was $2,400 whereas the supplement for a varsity assistant coach that year was $3,000.  (Pla. Ex. p. 019).

On February 13, 2003, Williams and head football coach Vince DiLorenzo met in Williams' classroom and held a discussion regarding Williams' role as a football

coach for the following season.  (Williams Depo. at 24-25).  At that time, DiLorenzo told Williams that the way he could best help the program was as coach of the junior varsity football team.

When DiLorenzo told Williams he wanted him to run the freshman football program, Williams asked DiLorenzo if that was the only thing he could do, and DiLorenzo stated that it was.  Williams responded, "[t]hat's not an option."  (*Id*. at 26).  Williams testified that he asked DiLorenzo why and was told that one reason was his failure to learn the wing-T offense.  (*Id*. at 28).

DiLorenzo testified that, despite this and one other perceived shortcoming, Williams related well to "the kids."  (DiLorenzo Aff. at 4).  To take advantage of this strength, he thought that Williams would be a good freshman coach.  He stated that the jump from grammar school football to high school football was a big step and that the school needed to retain as many students as possible in the football program.  He believed that Williams was well suited for this responsibility.  (*Id.*).  While the head freshman coach position paid about $1,000 less that the assistant varsity position, DiLorenzo testified that the freshman coach had fewer games and practices and less planning.  Furthermore, as head freshman coach, DiLorenzo believed Williams would

have been in a much more visible role than as an assistant varsity coach.  (DiLorenzo Aff. at 5).

Williams testified that DiLorenzo also told him that another reason he was moving him to the freshman head coach position was his failure to get along with the other coaches.  Coach DiLorenzo specifically mentioned Eddie Garfinkle.  (Williams Depo. at 28).  Garfinkle was the defensive coordinator.  (DiLorenzo Depo. at 74).

According to Williams, Garfinkle made racially derogatory statements such as that African-American athletes were not smart enough to play linebacker.  Williams cannot recall the date of this comment other than that it occurred between 2001 and 2004.  (Williams Depo. at 28-29).  Williams testified that he brought this and other comments by Garfinkle to the attention of DiLorenzo but, to his knowledge, DiLorenzo did nothing about it.  (*Id*. at 30-31).  However, after he complained to DiLorenzo, Garfinkle made no more references to any students that African-Americans were not smart enough to play linebacker.  (*Id.* at 175).

DiLorenzo testified that, while Williams complained about comments by Garfinkle, he never told DiLorenzo he had made any overtly racial remarks, and DiLorenzo would not have allowed a coach to state that any race of players was not

smart enough to play a position.  He further testified that Williams complained to him on only one occasion.  (DiLorenzo Depo. at 77-79).

DiLorenzo testified that his recollection was that Williams complained that Garfinkle had stated that a particular player was not smart enough to play the linebacker position.  He also recalled that Williams was upset that Garfinkle referred to black athletes as "brothers."  Although he could not recall the exact remark Williams complained of, he spoke to Garfinkle about it and told him that he would prefer that he not use that term again.  (*Id*. at 73-80).

DiLorenzo also testified that Williams became unwilling to be cooperative with the offensive coordinator in coaching the offense.  (*Id.* at 87).  Until the spring of 2003, the offensive coordinator was Mike Argo.  That spring, DiLorenzo demoted Argo from offensive coordinator to running backs coach and hired Bryant Vincent to replace him.  (*Id*. at 95-96).  Williams testified that he never had a problem with any other coaches.  (Williams Depo. at 32).  Williams was never asked to resign from his position as football coach, but he never coached football after his February 13, 2003, meeting with DiLorenzo.

Williams also asserted as evidence of discrimination that, after he resigned, he received a memo from Kevin Sherer asking him to return his Spain Park coaching

clothes; in particular, his rain suit.  He testified that he had coached at three schools and had never been asked to return coaching clothing.  Sherer was a member of the coaching staff.  Williams stated that DiLorenzo "apparently" instructed Sherer to do this.  However, he also testified that he never spoke to DiLorenzo or Gena Morris about this.  (*Id*. at 33-35, 40).

In addition, Williams testified that he was familiar with the wing-T defense and that he had learned it at a clinic at the University of Delaware.  (*Id*. at 88).  In the spring of 2003, shortly after his conversation with Williams, Coach DiLorenzo switched the offense used by Spain Park from a wing-T to a west coast spread offense.  (DiLorenzo Depo. at 85).  According to Williams, he was replaced as wide receivers coach by Will Smith, a Caucasian male he asserts was less qualified than him.  (Williams Depo. at 146).

Williams testified that DiLorenzo never made any discriminatory remarks to him or did anything that indicated to Williams that he was racially discriminatory towards him.  (*Id*. at 94-95).

Williams also worked initially as a varsity assistant basketball coach under Gena Morris.  Morris wanted Williams to work as the head coach for the junior varsity girls basketball team.  However, Williams stated that he did not want to coach

the junior varsity team because he only wanted to coach teams that had an opportunity to win a state title.  (Williams Depo. at 117-18).  Morris testified that Williams told her that he did not want to be head coach of the girls junior varsity team because he was not qualified to be the head coach.  He wanted to be an assistant varsity coach. (Morris Aff. at 2).  She agreed to this request with the understanding that he would learn from her how to coach girls so he could coach the junior varsity team when she needed him to do this.  According to Morris, she wanted Williams to learn her techniques, strategies and coaching philosophies and then move on to the junior varsity to teach them what was being done at the varsity level.  (*Id*. at 2-3).  However, Morris stated that over the next three years plaintiff failed to make much progress in this regard and the females she hired were "vastly more qualified" in this regard.  (*Id*. at 2-3, 5).

According to Gena Morris, Williams was not much help his first season with the girls varsity basketball team.  His football duties kept him from attending fall tryouts, and spring training for football also interfered.  The following school year, 2002-2003, she asked Williams to coach the junior varsity team but he did not want to do it.  This caused Morris to recruit a volunteer coach who was not an employee of the Hoover School System.  (*Id*. at 3).

During the 2003-2004 school year, Morris again asked Williams to coach the junior varsity team, but he was not interested. During this same year, she hired Kelly Holland as an assistant varsity coach. Holland played basketball for four years at the University of Alabama and coached at the University of Alabama, Auburn University in Montgomery, Smith Station High School, and Robert E. Lee High School. (*Id*. at 3-4). Williams remained on the varsity squad that year. (*Id*. at 4). For the 2004-2005 school year, Morris also hired Amy Woods as a junior varsity coach. Woods was a Spanish teacher and had been an outstanding basketball player at Gardendale High School and Birmingham-Southern College. Morris had observed her at basketball camps at Birmingham-Southern working with Morris' teams. Morris also was aware that Woods had extensive experience with coaching AAU basketball and had run a very successful basketball youth camp. (*Id.*; Morris Depo. at 46-47).

During the 2003-2004 school year, Morris became the athletic director for Spain Park, which she agreed to do as long as she could continue to coach basketball. (Morris Aff. at 3; Morris Depo. at 43). Morris testified that Williams' knowledge of basketball and his ability to communicate basketball and techniques and skills to the varsity team was "limited, at best." She stated that she needed someone who, during all the games, had a better knowledge base and more of an ability to contribute at the

varsity level.  She decided that this person was Kelly Holland.  (Morris Depo. at 49, 75-76).  According to Morris, Holland and Woods were vastly more knowledgeable and more effective at teaching the sport than plaintiff.  (Morris Aff. at 5; Morris Depo. at 89).  Nonetheless, Williams remained on the staff as a varsity assistant coach.

Morris testified that, at the end of the 2003-2004 school year, she asked Williams to become the junior varsity coach.  According to Morris, initially, he agreed.  However, on June 22, 2004, Williams sent Morris a letter of resignation as a girls basketball coach at Spain Park.  (Morris Aff. at 4, 6, and Ex. 1, Letter of Resignation dated June 22, 2004).  Morris stated that she had no warning that this would occur and did not request Williams to resign.  After he quit, she tried to contact him to work something out, if possible, but he did not return her calls.  (Morris Aff. at 5).

Williams, however, testified that he was never specifically told that he was going to be placed in charge of the freshman girls basketball team.  He concluded this based on his perception that the newly-hired coach, Amy Woods, was being allowed to usurp his duties and because he was not paid for his participation in a summer

basketball camp at Vanderbilt University while everyone else was paid.  (Williams Depo. at 138-39).

Williams claims that Kelly Holland and Amy Woods, who also attended the camp, were paid and he received nothing.  (*Id*. at 122).  Williams testified that he never asked Morris why he was not compensated.  (*Id*. at 123-24).  He testified that he knows that Woods and Holland got paid for attending the Vanderbilt camp because he saw the checks from Vanderbilt University.  (*Id*. at 178).  However, he could not say whether Vanderbilt or people in the Hoover school system made the determination who to pay.  (*Id.* at 183).  In particular, he testified that he does not know whether Morris had anything to do with who Vanderbilt issued checks to and does not know whether Morris was ever aware that he did not receive a check.  (*Id.* at 183-84).

Morris states that neither she nor Holland was paid for attending this camp, but she does not know whether Woods was paid.  Morris testified that all she received from Vanderbilt was a shirt that she swapped for a pair of shorts.  (Morris Depo. at 63-64).

Williams also testified that when Amy Woods became an assistant varsity coach, she began to assist Morris in running the offense.  (Williams Depo. at 132).

Although his official position had not changed, Williams felt that she was taking over his position because she was putting on the new offense and showing it to Morris. (*Id*. at 137).  However, he was never told that he was going to be removed or demoted from his position as assistant varsity coach.  (*Id*. at 139-40).

Williams states that when Amy Woods came in, Morris was changing the offense to the Princeton offense.  According to Williams, this is an offense that Woods had been running previously; therefore, when she came in, she started teaching everyone about this offense, including "the little intangibles, that naturally helps." (*Id*. at 177).  This was the principle duty which Williams claims Woods took over from him.  (*Id*. at 178).

According to Williams, Morris never said anything to him to indicate that she discriminates against African-Americans in general or against Williams in particular. (*Id*. at 142-43).  He contends that Morris' actions in allowing Amy Woods to take over the offense and her failure to sign a requisition for him to get paid for the Vanderbilt camp were evidence that he was being replaced by a less qualified white female.

## DISCUSSION

Defendants concede that Williams can establish a *prima facie* case of discrimination under *McDonnell Douglas, supra*. However, they assert that they have articulated a legitimate, non-discriminatory reason for their treatment of Williams. (Doc. #26, Defendants' Brief, at 27). They further assert that plaintiff has failed to prove that any of their proffered reasons are pretextual. (*Id.*).

### A. <u>Football Coach Position</u>

According to defendants, Vince DiLorenzo asked plaintiff to become head coach of the junior varsity team on February 13, 2003. Williams stated that he was not interested and resigned. According to DiLorenzo, Williams had been ineffective as the wide receivers coach, and the other coaches did not think that he agreed with the effectiveness of the offensive scheme they were using on the varsity level. They assert that these are legitimate, non-pretextual reasons for this change in assignments.

According to defendants, the non-pretextual nature of this reassignment is demonstrated by evidence that Williams had worked with ninth and tenth grade football players during his first year at Spain Park and DiLorenzo thought that he related well to these younger students. Williams agrees that he related well to them. (*Id.* at 22).

Although defendants acknowledge that this move would have entailed a reduction in salary for plaintiff, they assert that the freshman team is vitally important to the football program. They assert that the transition from grammar school football to high school ball is a rough and challenging change that needs a coach who can work as a positive role model and be effective in keeping the young players committed to football. (*Id.* at 23).

Defendants also claim that evidence presented reflects that DiLorenzo hired Williams to be a part of his inaugural staff when Spain Park opened. DiLorenzo also coached at Gadsden High School for 20 years where his long-term assistant was African-American. According to defendants, there is no evidence that anyone ever had accused DiLorenzo of discrimination before the filing of this lawsuit.

Defendants further claim that changes were made across racial lines, proffering as an example Coach Mike Argo, a Caucasian assistant coach reassigned from offensive coordinator to running back coach. Finally, they point out that Williams simply quit. They claim that he did not ask for a different position.

Plaintiff takes issue with several of defendants' assertions and contends that they did not have a legitimate non-discriminatory reason for demoting him. While conceding that he was able to relate well to youth of all ages, plaintiff asserts that

high school does not become any less challenging after the freshman year.  Thus, he states that the claim that he related well to the ninth graders did not justify his demotion to the freshman coaching position.[1]  (Doc. #28, Plaintiff's Reply Brief, at 17-18).

Plaintiff also disputes defendants' assertion that he was ineffective as the receivers coach and that the other coaches thought that he had not bought into the offensive scheme being utilized by DiLorenzo.  Williams notes that there are no affidavits of any other coach at Spain Park backing up the latter claim.  He also points to the fact that he has a record of success as a player and a coach and that he has amassed an impressive record of helping high school players advance to the collegiate level.  (*Id.* at 18-19).  Williams also states that the mere fact that he did not like the offensive scheme used by DiLorenzo does not mean that he could not or would not see that the players learned and executed that scheme.

Plaintiff also points out that, although defendants claim that he had trouble getting along with other coaches, he has identified Coach Garfinkle as the only coach with whom he had problems.  There are no affidavits from other coaches asserting

---

[1]  No one disputes that the freshman coaching positions received a smaller salary supplement than the varsity positions.  While defendants assert that the reason is the freshman positions require less work, a reduction in salary is the result.  Thus, plaintiff's description of this change as a "demotion" is not inaccurate.

that they had any difficulty getting along with Williams.  Garfinkle is the individual about whom Williams complained because of his allegedly racially insensitive remarks to Williams and others.  (*Id.* at 19-21).

With regard to the claim that Caucasian coach Mike Argo also was demoted, plaintiff notes that, despite his reassignment, Argo remained a varsity coach.  He further claims that he was replaced by a Caucasian coach, Will Smith.  (*Id.* at 21-22).

Finally, Williams disputes the claim that he did not challenge his move to junior varsity.  Williams stated that he wished to remain with the varsity and asked if there was anything else he could do.  Williams states that, only after it was made clear that DiLorenzo would not change his mind, he decided to resign.  (*Id.* at 22).

In response, defendants note that it was not just DiLorenzo who believed that Williams had not adequately learned the wing-T offense.  It was an opinion shared by his offensive coordinator.[2]  (See DiLorenzo Depo. at 51-53, 56).  Furthermore, DiLorenzo testified that he did not consider the job a demotion.  He simply evaluated the coaches for positions in which he thought they would be most successful.

---

[2] It is interesting to note that the offensive coordinator whom DiLorenzo cites to bolster his claim that Williams was not able to effectively teach the wing-T offense, Mike Argo, was himself demoted in the spring of 2003 to running backs coach and replaced by a newly-hired coach. However, there is no evidence in the record regarding why Argo was demoted and thus no reason to conclude that DiLorenzo's reliance on his opinion of the abilities of Williams with regard to the wing-T offense was unreasonable.

Defendants claim that DiLorenzo testified that other coaches complained about Williams, not just Garfinkle.  (Doc. #30, Defendants' Reply Brief, at 8 ¶ 4).  In the citation provided, the only other coach mentioned is the offensive coordinator.  However, in the latter cited testimony, DiLorenzo clarifies this, stating that he did not say that the offensive coordinator did not get along with Williams, but he merely felt that he did not "believe in what they were doing."  (*See* DiLorenzo Depo. at 51, 65).

Defendants also claim that another Caucasian coach, Donald Spence, was subsequently asked to move from varsity to ninth grade coach.  However, the citation to the record provided by defendants (Morris Depo. at 30-31) does not back up this assertion.  It reflects that a David Spencer is currently the ninth grade coach.  There is no testimony that he was moved from a varsity coaching position to the junior varsity position.

Defendants also dispute plaintiff's claim that he was replaced by a white coach.  They state that other coaches assumed Williams' responsibilities when he resigned, but no one was hired to replace him.  The person who was brought in to replace Williams was Will Smith, who was already on staff as a baseball coach.  (Doc. #30, Defendants' Reply Brief, at 8 ¶ 5).  They also point out that Williams acknowledges

that it was DiLorenzo who recommended that he be hired at Spain Park and that DiLorenzo never said or did anything else that he considered racially discriminatory.

## Analysis

To satisfy the burden of production of a legitimate, non-discriminatory reason for a personnel action offered to rebut a *prima facie* showing of discrimination involving circumstantial evidence, "the defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094 (citation and footnote omitted); *Combs*, 106 F.3d at 1529.  "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096.  Under this standard, defendants have established a legitimate, non-discriminatory reason.

Although plaintiff complains that defendants have not produced affidavits of other coaches regarding his alleged inability to run the wing-T offense or get along with other coaches, defendants' burden under *Burdine* is only one of production, not of proof.  Defendants have provided several reasons for moving plaintiff to the

freshman coaching position.  DiLorenzo, who made the decision to move Williams, testified that both he and his offensive coordinator believed that Williams had not learned or would not learn to teach the wing-T offense effectively to the receivers. He also testified that Williams failed to get along with other coaches, though this has not been substantiated with any other proof.  In addition, he moved Williams to the freshman coaching position because he believed plaintiff could help the team best in this position.  He testified that they needed to keep as many players continuing to play football after their freshman year as possible and that Williams' ability to motivate and otherwise connect with youth made him the person for this position.  Based on this, defendants have effectively rebutted plaintiff's *prima facie* case of discrimination.

When the defendant successfully rebuts the plaintiff's *prima facie* case, "the presumption of discrimination is eliminated."  *Chapman v. AI Transp*., 229 F.3d at 1024.  To survive summary judgment, the plaintiff must then "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Id.* (quoting *Combs*, 106 F.3d at 1528); *see also Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  To show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence."  *Combs*, 106 F.3d at 1538.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim."  *Chapman*, 229 F.3d at 1024-25; *see also Cooper v. Southern Co.*, 390 F.3d at 725-26; *Combs*, 106 F.3d at 1529 (explaining that the plaintiff must present "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action").

Although Williams correctly asserts that high school does not get any easier after the freshman year, he states that this rebuts defendants' claim that he was placed in the junior varsity position because of his ability to relate to youth.  It does not. DiLorenzo testified that in addition to the fact that the move from grammar school to high school football was difficult, he also noted that Spain Park needed to retain as

many players in the program after their freshman year as possible and that Williams had the ability to motivate and communicate well with young people.  He believed that this ability would serve to influence students to continue playing football.

Even though Williams points out that defendants failed to produce any affidavits from other coaches regarding his ability to teach the wing-T offense or to get along with other coaches, defendants' burden in establishing a legitimate, non-discriminatory reason for the action taken is one of production, not persuasion. *Burdine, supra.*  The burden remains with plaintiff to produce evidence that reflects that this reason contains "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538.

Williams admits that he did not like the wing-T offense.  Although he states that he learned this offense at a seminar at the University of Delaware, he merely disputes DiLorenzo's claim that he did not know the offense very well.  He presents no evidence to contradict DiLorenzo's testimony that he and the offensive coordinator believed that he did not run the offense very well and appeared unwilling or unable to teach it to the receivers.  Even assuming Williams knew the wing-T

offense as well as any other coach on the team, that fact is irrelevant.  What is important is the decision-maker's belief which, even if wrong, is not discriminatory unless the plaintiff produces evidence to the contrary.

By his own admission, Williams has never heard any statements or observed DiLorenzo do anything during the years he worked at Spain Park that reflected any discriminatory bias.  Although he testified that he was unaware that DiLorenzo addressed his complaint about Garfinkle, DiLorenzo testified that he did, in fact, talk to Garfinkle about the statement attributed to Garfinkle by Williams.  Williams further testified that, after he complained to DiLorenzo, there were no further statements by Garfinkle about black players not being smart enough to play certain positions.

Likewise, Williams asserts that, despite DiLorenzo's claim that part of the reason he moved plaintiff to the freshman team was inability to get along with other coaches, the only one DiLorenzo identified was a coach about whom plaintiff had complained with regard to an allegedly racially biased comment.  Defendants assert that plaintiff also appeared unwilling to work with the offensive coordinator, in addition to Garfinkle.  However, as noted above, in reality the offensive coordinator was not alleged to have had difficulty getting along with Williams; he simply

believed that Williams was not teaching the wing-T offense effectively to his assigned players.

Nonetheless, whether plaintiff was having trouble getting along with only one coach or more than one coach is not a significant discrepancy. Furthermore, even if Williams had a good reason for not getting along with Garfinkle, DiLorenzo's statement that this was a problem is not false. In addition, even though he never heard Garfinkle make any more statements about blacks not being smart enough to play a particular position, plaintiff's inability to get along with Garfinkle continued. The only other references by Garfinkle that Williams found offensive were Garfinkle's references to African-Americans on the team as "those guys." (Williams Depo. at 175). Although Williams took offense at these references, there is nothing overtly discriminatory about them or clearly reflective of a racial bias. There is also no evidence that Williams carried his complaint any further up the school chain of command beyond Coach DiLorenzo, such as to the school principal or the Board of Education.

Thus, not only is DiLorenzo's assertion that Williams had trouble getting along with Garfinkle not false, Williams' stated reason for his inability to get along with Garfinkle was addressed by DiLorenzo with regard to one comment and the other

(referring to African-American players as "those guys") is not one that would generally be perceived as overtly racist.  Consequently, Williams has failed to demonstrate that this stated reason for his demotion was pretextual.

Plaintiff's complaint regarding the fact that he was requested to return his school-provided coaches clothing also does not establish pretext.  First of all, this request was made by an assistant coach, not DiLorenzo, and Williams simply assumes it was done at DiLorenzo's direction.  However, there is no actual evidence of this in the record.  In any event, Williams did not return the clothing and nothing further was done about it.  Second, Williams asserts this action demonstrates pretext simply because he had never been asked to return clothing provided by any other schools where he coached.  He identifies no Caucasian coaches at Spain Park who resigned but were not asked to return their school-provided clothing.  Finally, this occurred after he had been told he was being assigned as the junior varsity head coach and after he had resigned.  Thus, it does not demonstrate that the earlier decision to reassign him was a pretext for discrimination.

## B. <u>Basketball Coach Position</u>

After he resigned his position as a football coach in February 2003, Williams continued as a coach for the girls basketball team.  During the 2003-2004 school year

he worked as a varsity assistant coach.  Morris testified that in the spring of 2004, she asked Williams to coach the girls junior varsity team for the 2004-2005 school year, and Williams agreed to do so.  Williams, however, disputes that, asserting that he was never specifically told that he was going to be placed in charge of the girls junior varsity team.  (Williams Depo. at 139-40).  In any event, on June 22, 2004, Williams sent Morris a letter abruptly resigning his position as basketball coach.

Williams was not asked to resign.  He gave no warning.  Unlike his discussion with DiLorenzo, there is no evidence in the record that Williams asked Morris if there was any alternative to moving to the junior varsity position.  Morris testified that she attempted to contact Williams after receiving his letter of resignation to see if she could work something out with him, but he never returned her calls.  In prior years, Williams had been asked to coach the junior varsity team; and, when he refused, he was kept on as a varsity assistant, and volunteers were recruited to coach the freshman team.  However, even assuming that Williams would have been reassigned to coach the freshman team against his wishes, there is no evidence that this was based on a racially discriminatory animus.

Williams asserts that there is evidence of discrimination in that he was not paid for his participation at a basketball camp at Vanderbilt University when Morris,

Holland, and Woods were compensated.  However, Morris testified that she was not compensated for her participation in the camp, except for receiving a too-large shirt that she traded for shorts.  She also testified that Holland told her that she had not been compensated, but did not know whether Woods was compensated or not.

Williams counters that he knows that Holland and Woods were compensated for their participation in the camp because he saw the checks from Vanderbilt University that they received.  Nevertheless, assuming this to be true, Williams also admitted that he did not know whether it was Vanderbilt or Morris that made the decision to pay these two coaches and not pay him.  Morris testified that she had nothing to do with anyone getting paid for participating in this camp, and there is no evidence to the contrary.

Williams also testified that he was constructively replaced as an assistant varsity coach because Holland and Woods were hired and began to assume more of what he considered to be his responsibilities as assistant varsity basketball coach. However, Williams testified that Morris had decided to implement the Princeton offense for the following school year and that Woods had been running this offense prior to coming to Spain Park.  As a result, she began to teach it to others.  He

conceded that she knew "the little intangibles" about this offense which was helpful in its implementation.  (Williams Depo. at 177).

In addition, Morris testified that Holland and Woods were vastly more qualified to coach girls basketball than was Williams.  Williams played basketball in high school and coached a ninth grade boys basketball team for one year.  When initially asked to coach girls basketball as his second sport by then-athletic director DiLorenzo, plaintiff did not want to do so and argued against it.  Morris testified that plaintiff stated that he did not want to coach the girls junior varsity team because he was not qualified to do so.

Kelly Holland played basketball for four years at the University of Alabama and coached at the University of Alabama, Auburn University in Montgomery, Smith Station High School and Robert E. Lee High School.  (Morris Aff. at 3-4).

Amy Woods had been an outstanding basketball player at Gardendale High School and Birmingham-Southern College.  Morris had observed her at basketball camps at Birmingham-Southern working with Morris' teams.  Morris also was aware that Woods had extensive experience with coaching AAU basketball and had run a very successful basketball youth camp.  (Morris Aff. at 4; Morris Depo. at 46-47). Furthermore, although she had not previously coached at the high school level,

Woods was experienced with the Princeton-style offense that Morris wished to implement at Spain Park the following school year.

Morris testified that Williams simply did not know enough about basketball to coach at the varsity level and, because of his ability to relate to youth, she believed he could best suit the program by coaching the junior varsity team.  While Williams disputes this, it is Morris' opinion about Williams' abilities that is significant, not his own opinion about himself.  Unless he can demonstrate that her analysis of his abilities is pretextual, the fact that it may be wrong is of no consequence.  Pretext means more than an inconsistency or a mistake; pretext is "a lie, specifically a phony reason for some action." *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001).  A plaintiff cannot establish pretext by merely questioning the wisdom of the employer's reasoning, especially where "the reason is one that might motivate a reasonable employer." *Lee v. GTE Florida, Inc*., 226 F.3d 1249, 1255 (11th Cir. 2000) (quoting *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)).  Finally, courts cannot reexamine an employer's business decisions; the court's inquiry is limited to determining whether the employer gave an honest explanation for its behavior. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466,

1470 (11th Cir. 1991).  In this regard, Williams admits that he has never known Morris to do anything that was remotely discriminatory in nature.

When asked about this, Williams testified that Morris "wouldn't do that." There is no other evidence in the record to reflect that Williams was the subject of discrimination.  In fact, Williams asserts that he was never asked to be junior varsity coach and that he resigned because he thought "[i]t was clear" that Woods was taking over his position, a conclusion he reached based on his perception that everyone but him was compensated for the Vanderbilt camp.  (Williams Depo. at 138-39).

## CONCLUSIONS

Petitioner has stated no basis for liability on the part of the Hoover Board of Education.   Section 1983 does not impose *respondeat superior* liability on a governmental entity unless action pursuant to official policy of some nature caused a constitutional tort.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).  The undersigned magistrate judge finds, as a matter of law, that no liability attaches under § 1983 to the Hoover Board of Education.  The Supreme Court has held that, unlike various government officials, municipalities do not enjoy immunity from suit, either qualified or absolute, under § 1983.  To impose liability on the school board as a unit of local government, the

plaintiff must allege that the challenged conduct executed the official policy or custom of the school board. *Arnold v. Bd. of Educ. of Escambia County, Alabama*, 880 F.2d 305, 315 (11th Cir. 1989). A claim of *respondeat superior* is insufficient to impose liability on the school board. *Id.* at 310, 316 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed. 2d 452 (1986)). Plaintiff has failed to demonstrate that the challenged conduct complained of by him was the result of the execution of official policy or custom of the Hoover Board of Education. Therefore, no liability attaches.

Likewise, for the reasons expressed above, plaintiff has failed to demonstrate that defendants' stated legitimate, non-discriminatory reasons for Williams' treatment was a pretext for discrimination.

Plaintiff has invoked 42 U.S.C. § 1983 as a basis for relief in this action. While the complaint alleges only that defendants' "discriminatory actions toward plaintiff were in violation of 42 U.S.C. § 1983," it does not mention any specific right, privilege or immunity secured by the Constitution and laws of the United States. If it is assumed that plaintiff is trying to assert a violation of his due process rights, his claim fails. He has not established that he was anything but an at-will employee, with no due process right in remaining in his position at Spain Hill. *See Cashman v.*

*University of Alabama Bd. of Trustees*, 2007 WL 4468662 * 2 (11th Cir. Dec. 21, 2007).  Further, because the court has determined that plaintiff has failed to present sufficient evidence of discriminatory action by defendants, he also cannot make out an equal protection claim.  The analysis for the Title VII and § 1983 discrimination claims is the same.  *See Underwood v. Perry County Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005).

Based on the foregoing, the Court finds that defendants' Motion for Summary Judgment on behalf of Vincent DiLorenzo, Gena Morris and the Hoover Board of Education is due to be granted as to each defendant and this action dismissed with prejudice.  A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 8th day of February, 2008.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE